*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1833**

State of Minnesota,
Respondent,

vs.

James Wayne Davis-Drew,
Appellant.

**Filed January 11, 2016
Affirmed in part, reversed in part, and remanded
Ross, Judge**

Ramsey County District Court
File No. 62-CR-13-8144

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Chutich, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

A jury found James Davis-Drew guilty of second-degree intentional murder and second-degree felony murder after Davis-Drew killed E.P. and robbed him of all the money

in his wallet. Davis-Drew challenges the sufficiency of the circumstantial evidence and argues that the district court abused its discretion by admitting *Spreigl* evidence of his prior aggravated robbery. He also argues that the district court erred by convicting him of the included offense of second-degree felony murder. Because the circumstantial evidence supports his convictions and because admission of the challenged evidence does not constitute an abuse of discretion, we affirm. But because the district court erred by convicting Davis-Drew of the included offense of second-degree felony murder, we reverse and remand for the district court to vacate the conviction on that count.

**FACTS**

The jury found Davis-Drew guilty after it heard evidence of the following events. E.P. finished his shift at Target's distribution center in Fridley at 2:00 on an early October 2013 morning. On his way home, he stopped by an automatic teller machine and withdrew $340, dropped off a coworker, and stopped at a gas station. He there encountered three men, all strangers to him: T.E., who walked using crutches, and T.E.'s two friends, G.T. and Davis-Drew. T.E. asked E.P. to give him and his companions a ride to St. Paul, and E.P. agreed.

E.P. and Davis-Drew began smoking marijuana during the drive. E.P. pulled into an alley between Minnehaha Avenue and Van Buren Avenue to avoid being seen by police. T.E. and G.T. left the car and walked to another friend's house on Van Buren Avenue. Davis-Drew remained, still smoking marijuana with E.P.

G.T. soon telephoned for a cab to take him to the east side of St. Paul. The cab arrived and picked up G.T., T.E., and two women. By this time, Davis-Drew was at his

2

brother's house, also on Van Buren Avenue. When G.T., T.E., and their two female companions attempted to enter their cab, Davis-Drew appeared outside and asked if he could join them. The cab driver refused to accept more than four passengers, so the four left without him.

Davis-Drew called for his own cab, which arrived 10 to 15 minutes later, at 3:40 a.m. He told the driver that his name was "Twan Johnson," paid him $20 in advance, and asked to be driven to the Greyhound bus station. He told the driver that he was taking the bus to Chicago to meet his father for the first time. Things didn't seem right to the cab driver; he thought that Davis-Drew "seemed off." The trip appeared to have been a spur-of-the-moment decision involving no planning. Davis-Drew claimed at trial that he was really planning to visit his siblings in Kansas City and claimed never to have said anything to the driver about going to Chicago. In any event, Davis-Drew never boarded a bus. The Greyhound station was closed when he arrived. He went to his girlfriend's house.

At about 7:00 a.m. that same morning, police found E.P. dead, with his body slumped beside his car in the alley between Van Buren Avenue and Minnehaha Avenue. The medical examiner arrived at 9:30 a.m. and estimated that E.P. had been dead for 6 to 12 hours. He concluded that E.P. bled to death from four gunshot wounds. He could not recover two of the bullets, but a forensic scientist determined that the other two were .38 caliber and fired from the same gun. Five days before the shooting, Davis-Drew asked someone in a Facebook chat, "Know anybody that need 38 spl hollows?" This references .38 special hollow-point ammunition.

One neighborhood witness reported hearing four gunshots at about 3:12 a.m. Another witness saw a man on crutches walking on Van Buren Avenue also shortly after 3:00 and heard one or two shots from the alley.

Police searched the area. They found E.P.'s wallet—money removed—inside a grill in the front yard of the house of Davis-Drew's brother. This was the same house Davis-Drew entered after he left E.P.'s car. Laboratory testing of the wallet revealed a mixture of DNA from two or more individuals. The results excluded 98.6% of the general population from being possible contributors of the DNA. Testing excluded G.T., but it did not exclude Davis-Drew.

Police arrested Davis-Drew on October 22, about 10 days after the killing. Davis-Drew told police that E.P. had given him a ride but claimed falsely that he did not know the names of the other two people in the car. Davis-Drew also falsely stated that he was never in the front seat of E.P.'s car. The state charged Davis-Drew with second-degree unintentional murder while committing aggravated robbery, second-degree intentional murder, aiding and abetting second-degree felony murder, and aiding and abetting second-degree intentional murder.

Davis-Drew admitted during the trial that he had lied to the police by claiming he did not know T.E. and G.T. He also admitted to having been in the front seat of E.P.'s car. Davis-Drew told the jury that he had left the car before G.T. left it and that G.T. was the last person who was with E.P. before his death. The jury found Davis-Drew guilty of both second-degree intentional murder and felony murder, and it found him not guilty of aiding and abetting these crimes. The district court entered a judgment of conviction on both

4

counts of second-degree murder and sentenced Davis-Drew to 360 months in prison on the second-degree intentional murder charge. Davis-Drew appeals his convictions.

## D E C I S I O N

Davis-Drew argues that the circumstances proved do not eliminate the reasonable hypothesis that he did not kill E.P. and that the district court abused its discretion by admitting *Spreigl* evidence of his prior aggravated robbery. Davis-Drew also argues that the district court erred by convicting him of the included offense of felony murder. Only his last argument merits reversal in part.

## I

Davis-Drew argues that the circumstances proved do not eliminate the reasonable hypothesis that he did not kill E.P. When considering a challenge to the sufficiency of the evidence, we review the record to determine whether the evidence was sufficient to permit the jury to reach a guilty verdict. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). When a conviction rests on circumstantial evidence, our scrutiny on review is heightened. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). Despite calling for higher scrutiny, circumstantial evidence still carries the same weight as direct evidence. *State v. Bauer*, 598 N.W.2d 352, 370 (Minn. 1999). Under this heightened standard, "the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt." *Al-Naseer*, 788 N.W.2d at 473 (quotation omitted). We start by identifying the circumstances proved. *Id.* We defer to the jury's acceptance of these circumstances and its rejection of contrary evidence. *Id.* We then

5

examine the reasonableness of all inferences that could be drawn from the circumstances, including reasonable inferences consistent with hypotheses other than guilt. *Id.* at 473–74.

When viewed in the light most favorable to the conviction, the circumstances proved here are as follows. Davis-Drew was the last person seen with E.P. immediately before two witnesses heard gunshots. At least two of the bullets that struck E.P. were .38 caliber bullets fired from the same firearm and were the same caliber rounds that Davis-Drew inquired about on Facebook five days before the murder. Police found E.P.'s wallet, stripped of its cash, inside a grill at the same house where Davis-Drew went after he left E.P.'s car at about the time of the shooting. DNA testing indicated that Davis-Drew (but not G.T.) is among the very small percentage of people whose DNA could have been on the wallet. Almost immediately after E.P. was shot to death, Davis-Drew either decided suddenly and spontaneously to take a bus trip to Chicago or to Kansas City without checking the bus schedule or the depot's hours of operation, or he lied about making that sudden decision. He lied to a stranger—the cab driver who was taking Davis-Drew away from the scene of the murder—about his identity. He also lied to police about knowing T.E. and G.T. and told police falsely that he had not been sitting in the front seat with E.P.

We next consider the inferences that could be drawn reasonably from these proved circumstances. To support a conviction, the circumstances "must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *Id.* at 473 (quotation omitted). They clearly do. These circumstances tend to indicate that Davis-Drew shot E.P., robbed all his cash from his wallet, stuffed the wallet inside a grill as he walked

6

to his brother's house, and then hastily attempted to flee the scene by cab. Only Davis-Drew's guilty mind reasonably explains his wanting to leave the area suddenly and, according to him, his wanting to leave the state, immediately after the killing. And nothing except his guilt reasonably explains his lies to the cab driver and to police. The alternative he suggested at trial—that G.T. killed E.P.—is not reasonable because we assume that the jury disbelieved Davis-Drew's testimony that G.T. was the last person with E.P. and because DNA testing excluded G.T. from being a contributor to the DNA on E.P.'s wallet.

At oral argument, Davis-Drew's counsel offered that some unknown person might have appeared in the alley after Davis-Drew left, shot E.P. four times, and put E.P.'s wallet inside the grill at the house where Davis-Drew happened to be staying. This story is not an impossible one, but it is so unlikely that it is not reasonably inferred from the circumstances. No witness saw any other person in the alley that very early morning, and the window of opportunity for someone other than Davis-Drew to have committed the murder is extremely narrow. A mere possibility of innocence does not lead us to reverse a jury's verdict when the evidence as a whole makes the innocent theory unreasonable. *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002). The circumstantial evidence as a whole forms a complete chain that leads so directly to Davis-Drew's guilt that it excludes beyond a reasonable doubt any reasonable inference other than his guilt. The circumstantial evidence was therefore sufficient for the jury to find Davis-Drew guilty.

## II

The district court allowed the state to introduce *Spreigl* evidence of Davis-Drew's prior aggravated robbery. In November 2007, Davis-Drew was at a party on Van Buren

Avenue a few blocks from where E.P. was killed. During that party, Davis-Drew was outside when two men came out. Davis-Drew asked one of the men for a cigarette, punched one of them, pushed him to the ground, and took his wallet, cell phone, knife, and marijuana. Davis-Drew also robbed the other man, going through his pockets and taking his wallet and cellular phone. And during the robbery, Davis-Drew threatened to kill both the men. Davis-Drew and two accomplices then drove the victims to the Battle Creek area of St. Paul, forced them into the woods, stripped them of their clothing, and left.

Davis-Drew argues that the district court's admitting evidence of this robbery requires reversal. We review the district court's decision to admit other-crimes evidence (commonly called "*Spreigl* evidence") for an abuse of discretion. *State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006). Davis-Drew has the burden of showing error and any resulting prejudice. *Id.* *Spreigl* evidence is not admissible to prove the bad character of the accused to show that he acted consistent with his character. Minn. R. Evid. 404(b). But *Spreigl* evidence may be admitted for other purposes, such as proof of identity, motive, or absence of mistake. *Id.* Courts use a five-step process to determine whether to admit *Spreigl* evidence:

> (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant.

*Ness*, 707 N.W.2d at 685–86.

8

Davis-Drew argues that admitting the evidence here fails based on the fourth and fifth steps. He maintains that the *Spreigl* evidence was irrelevant to the state's case and that its probative value was not outweighed by its potential prejudice. "*Spreigl* evidence may be relevant and material to show the identity of the perpetrator if identity is at issue and if there is a sufficient time, place, or modus operandi nexus between the charged offense and the *Spreigl* offense." *State v. Wright*, 719 N.W.2d 910, 917 (Minn. 2006) (quotation omitted). The prior crime need not be a "signature" crime but must be markedly similar to the incident at issue. *Ness*, 707 N.W.2d at 688.

The district court determined that the prior aggravated robbery was relevant to show motive, intent, and identity. The determination is well founded. The *Spreigl* crime and the charged crime were similar in seven ways, making them markedly similar. Both were crimes of opportunity. Both crimes were aggravated robberies. In both instances, Davis-Drew met the victims through chance encounters and became friendly with them before they were robbed. The robber took the victims' wallets in both crimes. Both crimes involved marijuana, though one involved smoking it and the other stealing it. The robber threatened to kill or actually killed the victims in both crimes. And both crimes occurred in the same neighborhood, within a few blocks of each other.

The *Spreigl* crime took place almost six years before the charged crime. But this does not argue against its admissibility in this case. "[T]he more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance." *Wright*, 719 N.W.2d at 918. *Spreigl* incidents that are more temporally distant may be less objectionable if "the defendant spent a significant part of that time

9

incarcerated and was thus incapacitated from committing crimes." *Id.* Davis-Drew was sentenced to 55 months in prison for his prior aggravated robbery, so admitting the *Spreigl* evidence was less objectionable even though the offense took place six years prior. Because the prior robbery was markedly similar to the charged crime, the prior robbery was relevant and material to show motive, intent, and identity.

"*Spreigl* evidence must [also] not be more prejudicial than probative." *Id.* The district court must balance the probative value of the *Spreigl* evidence against the concern that the jury might use the evidence for an improper purpose, such as demonstrating that the accused has a propensity to commit the crime. *Id.* The district court must also take into account the state's need for the evidence. *Id.* The district court here determined that the state's need for the *Spreigl* evidence was high. The state's need was high because this was a circumstantial case with no direct evidence identifying Davis-Drew as the one who shot E.P. and took his wallet, and Davis-Drew's defense was that the shooter was someone other than him. The probative value of the evidence was high because the *Spreigl* offense was markedly similar to the charged offense, tending to prove Davis-Drew's identity. The district court's limiting instruction to the jury mitigated any potential prejudice. *See State v. Riddley*, 776 N.W.2d 419, 428 (Minn. 2009) ("We presume a jury follows a court's cautionary instruction."); *State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998) (concluding that a district court's reading of two standard cautionary instructions to the jury lessened the probability of undue weight being given to the evidence). For these reasons, the district court did not abuse its discretion when it admitted *Spreigl* evidence of Davis-Drew's prior aggravated robbery.

## III

The state concedes that the district court erred by convicting Davis-Drew of the included offense of second-degree felony murder. Whether an offense constitutes an included offense is a legal question we review de novo. *State v. Cox*, 820 N.W.2d 540, 552 (Minn. 2012). A defendant may be convicted either of the crime charged or of an included offense, but not both offenses. Minn. Stat. § 609.04 (2012). "[F]elony murder is an included offense of second-degree intentional murder." *State v. Lory*, 559 N.W.2d 425, 428–29 (Minn. App. 1997), *review denied* (Minn. Apr. 15, 1997). When a defendant is convicted of more than one charge for the same act, the district court must adjudicate formally and impose a sentence on one count only. *State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984). The other conviction should not be formally adjudicated. *Id.* If the adjudicated conviction is later vacated, the remaining conviction can then be formally adjudicated. *Id.*

The jury found Davis-Drew guilty of both second-degree intentional murder and felony murder. Because felony murder is an included offense of second-degree intentional murder, the district court erred by entering a conviction on both counts. We remand for the district court to vacate Davis-Drew's conviction of second-degree felony murder.

**Affirmed in part, reversed in part, and remanded.**